[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1241 
 I.
This case of a killing for hire presents thorny questions of the admissibility of many statements all seemingly hearsay. One series of such statements, however, has been declared non-hearsay by our co-conspirator rule. Another is similarly non-hearsay as it was consistent with the declarant's testimony given earlier as a part of the prosecution's case-in-chief and was offered to rebut an implied charge of improper influence or motive. Although the third falls within no exception to or exclusion from the hearsay rule, we find no significant effect upon the defendant's substantial right to a fair trial and affirm.
 II. A.
Virginia and Elster Joseph Ponthieux made their home in Utica, Mississippi. In June, 1983, they separated and never again lived together as husband and wife. Their divorce became final on March 25 or 26, 1984. Three months later, on June 22, 1984, Virginia married Thomas Charles Tucker and moved to Rankin County, Mississippi. On January 22, 1985, John B. Nixon, Sr., Henry Leon Nixon and Gilbert Jimenez made their way into the home of Thomas and Virginia Tucker, and Nixon, Sr., shot Virginia at point blank range. Virginia never regained consciousness and died sometime later in the hospital.
On January 23, 1986, Elster Joseph Ponthieux was formally charged with the capital murder of Virginia Ponthieux Tucker in an indictment returned by the Rankin County Grand Jury. See
Miss. Code Ann. § 97-3-19(2)(d) (Supp. 1987). Also charged in the same indictment were John B. Nixon, Sr., Henry Leon Nixon and John B. Nixon, Jr. Charges against all defendants were severed for trial.
On May 19, 1986, the case against Ponthieux was called for trial in Circuit Court sitting in Brandon, Mississippi, and four days later the jury returned a verdict that Ponthieux was guilty of capital murder. Ponthieux was tried as a principal, on the theory that he was an accessory before the fact, in that he had hired Nixon, Sr., to murder his ex-wife. See Miss. Code Ann. §97-3-19(2)(d) (1972 and Supp. 1987); and Miss. Code Ann. § 97-1-3
(1972).[1] The following day the case entered the penalty phase whereupon the jury returned a verdict that Ponthieux should be sentenced to life imprisonment. The Circuit Court pronounced sentence in accordance with the verdict.
 B.
John B. Nixon, Sr., and his son, John, Jr., had moved to Utica in February of 1984 *Page 1242 
and opened a garage. Ponthieux, who lived down the road from the Nixon's shop, met the Nixons sometime between March and May 1984. The Nixons worked on his vehicles and equipment. Another Nixon son, Henry Leon Nixon, and an associate of his, Gilbert Jimenez, came from Texas to visit Nixon, Sr., sometime around the middle of January, 1985.
On the morning of January 22, 1985, at his home in Brandon, Thomas Tucker heard his wife say "Joe" or "John" or something beginning with a "J" as she opened the garage door, admitting Nixon, Sr., Henry Leon and Jimenez. Nixon, Sr., told Virginia, "I brought you something." Tucker told Nixon, Sr., that he knew Ponthieux had hired him to kill them and that they had money if that was what he wanted. Tucker claims that Nixon, Sr., replied "The deal's already been made." (During the commission of the crime, no one other than Tucker mentioned Ponthieux's name.) Henry Leon testified to virtually identical facts. Jimenez stated that Virginia did not call out any name, but that Nixon, Sr., did say "The deal done went down."
Nixon, Sr., shot at Tucker, but the gun misfired. Tucker ran. Nixon, Sr., shot Tucker once as he reached the front door, and when Tucker got up, Nixon shot him again. As Tucker was crossing the yard, Nixon, Sr., shot again and missed. Henry Leon testified to the same facts, but Jimenez stated that it was Henry Leon who fired the last shot at Tucker as he was crossing the yard.
Henry Leon, John, Jr., and Jimenez each testified that, prior to January 22, 1985, Nixon, Sr., had told him that he had been hired by Ponthieux to kill Virginia Tucker. Henry Leon also stated that Nixon, Sr., told him that he had already received some money from Ponthieux and had spent it and that the murder had to be done or they would be in danger of losing their lives.
One or two days before the killing, Nixon, Sr., told John, Jr., to go to Ponthieux' house to collect some money. John, Jr., did so, and in fact received $2300.00 from Ponthieux, who told him that he had already paid Nixon, Sr., a lot of money and that Nixon, Sr., was not to receive this money until after the job was done. Ponthieux also told John, Jr., that he would kill them all if anything happened to his son, Eddie. (Ponthieux denied that John, Jr., came to his house or that he gave him any money.) John, Jr., showed the money to his father, gave it to a friend to hold, and returned it to his father on January 22, 1985, after the murder was committed. Nixon, Sr., gave Jimenez $800.00 and Henry Leon $1,000.00 for their participation in the crime.
After the killing, John Jr., saw Ponthieux at a gas station in Utica and Ponthieux told him that his brother's talking was "going to get us all locked up." Henry Leon also testified that his father had told him that Ponthieux had said he would buy any of Virginia's jewelry that they were able to obtain when they killed her.
Jimenez' testimony implicating Ponthieux was a bit shaky. He testified that he first saw Ponthieux at the Nixon garage sometime around the middle of January, 1985, and that Ponthieux returned to the shop four or five times prior to the murder. John, Jr., stated that he never saw Ponthieux at the garage during January, 1985. On the witness stand, Jimenez said that Ponthieux did not have a mustache and was driving a Continental. In an earlier statement to police, Jimenez had described Ponthieux as: six feet two inches tall; heavy in weight, approximately 220 pounds; with a mustache; cowboy hat; and, driving a light pink Lincoln Towncar. Everyone else testified that Ponthieux did not have a mustache in January, 1985, or anytime thereafter, and did not drive a light pink Lincoln Towncar. Dick Liggett, a friend of Ponthieux's, also stated that the heaviest Ponthieux had ever been was 185 or 190 pounds and that he was shorter than five feet eight and a half inches. Ponthieux testified that he drove a beige 1977 Mercury and that he did not visit the Nixon shop at any time during January, 1985.
Henry Leon and Jimenez further testified that on the night of January 21, 1985, which was the night before the murder, they and Nixon, Sr., stopped by Ponthieux' house to pick up $700.00. They were driving *Page 1243 
Nixon, Sr.'s Toyota and Nixon, Sr., needed the money to buy a gun in Jackson. Jimenez stated that he and Henry Leon did not see the money change hands, but that when Nixon, Sr., got back in the car he said "I got the money. Let's get out of here. The man don't want to see you on this yard." Ponthieux denied that Nixon, Sr., Henry Leon and Jimenez came to his house that night.
Other facts will be related as are reasonably necessary to consideration of the issues on this appeal.
 III. A.
Ponthieux assigns as error the Circuit Court's overruling of his objection to Henry Leon Nixon's testimony concerning statements made by John B. Nixon, Sr., and by Ponthieux through Nixon, Sr. The said-to-be offensive testimony offered by Henry Leon Nixon may be summarized as follows:
 (1) His father told him that he, Nixon, Sr., had been paid to kill Virginia Tucker and that their lives would be in danger if they did not.
 (2) Henry Leon Nixon saw Ponthieux when they stopped by Ponthieux's house on the night before the murder to pick up $700.00 for a gun and expenses and that when his father returned to the car he stated he had received the money.
 (3) Nixon, Sr., told Henry Leon that he had already spent the money Ponthieux had given him and that Ponthieux had said his son was not to be harmed.
 (4) Nixon, Sr., told Henry Leon that her (Virginia's) husband would buy her rings back from them if they got them.
 (5) Out of the $2300.00 that Nixon, Jr., had been holding, Nixon, Sr., gave Henry Leon $1000.00 and Jimenez $800.00.
Ponthieux's objection to this testimony was — and is — that it is hearsay under Rule 801, Miss.R.Ev., inadmissible under Rule 802. The prosecution, however, argued that the case fell within the co-conspirators' exception to the hearsay rule. The Circuit Court agreed in principle but held that co-conspirators' statements would not be admitted into evidence until the prosecution had laid the predicate by establishing that Ponthieux had in fact conspired with the Nixons to kill Virginia Tucker.
After this ruling, John, Jr., testified that a day or two before Virginia was shot his father sent him to Ponthieux's house to pick up some money from Ponthieux and that he did receive $2300.00 from Ponthieux. John, Jr., next stated that around the time his father was arrested (sometime late in 1985) he saw Ponthieux at a gas station in Utica and Ponthieux "said something about my little brother was going to get us all locked up." John, Jr., also testified that on the day he received the $2300.00 from Ponthieux, Ponthieux told him (1) he had already paid Nixon, Sr., a lot of money, (2) the job had not yet been done, (3) Nixon, Sr., was not to receive the $2300.00 unless it was earned, and (4) if anything happened to his son he would kill the Nixons.
Defense counsel took the position that the co-conspirator exception only applied to conspiracy cases and that the proof of a conspiracy was "scanty" and, therefore, the prejudice of the co-conspirators' statements outweighed probativeness. The Circuit Court ruled, however, that the prosecution had made "a prima facie showing of a conspiracy" including Ponthieux. The Court noted further that this showing was unrebutted.
 B.
Once a conspiracy is established, a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy is admissible against each conspirator, notwithstanding the confrontation clause or hearsay rule. Rule 801(d)(2)(E), Miss.R.Ev.[2]; See also Williamson v. State,512 So.2d 868, 879 (Miss. 1987); Mitchell v. State,495 So.2d 5, 11 *Page 1244 
(Miss. 1986). Indeed, communications form the essence of the offense. As a matter of legal definition, such statements are not hearsay. They are factual elements of a criminal offense, not mere statements.
Before Henry Leon Nixon's testimony was admissible under Rule 801(d)(2)(E), the prosecution had the obligation to establish the preliminary fact of the existence of the conspiracy between Ponthieux and the Nixons, see Rule 104(a) and (b), Miss.R.Ev. It is no answer that Ponthieux was on trial for the principal charge of capital murder, rather than conspiracy to commit capital murder. See Damon v. State, 289 So.2d 720, 723 (Fla. 1973); see also, 4 Weinstein's Evidence, § 9801(d)(2)(E)[01], p. 801-229 (1984). The prosecution was entitled to offer evidence of the plan and motive and, to that end, to employ the Rule 104 procedure to establish Rule 801(d)(2)(E) admissibility by showing that a conspiracy preceded consummation of the principal offense. This is particularly true where, as here, the defendant is charged with having hired the victim killed and the prosecution is proceeding on an accessory-before-the-fact theory.
Where the Circuit Court holds a Rule 104 predicate hearing and where upon conflicting evidence (or allegedly inadequate evidence) that court finds the predicate to exist, our scope of review on appeal is limited. Questions of evidentiary and ultimate fact embodied in that predicate finding may be reviewed on appeal only as in other analogous cases. We will not disturb such findings of fact where there is in the record substantial evidence supporting the same. See, e.g., Lutes v. State,517 So.2d 541, 548 (Miss. 1987); Johnson v. State, 511 So.2d 1360, 1365 (Miss. 1987); Cabello v. State, 490 So.2d 852, 856 (Miss. 1986); and Gavin v. State, 473 So.2d 952, 954-55 (Miss. 1985).
While the Circuit Court is necessarily limited to the evidence offered at the Rule 104 hearing,[3] on appeal our view is much broader. We search the entire record to determine whether the preliminary fact has been established. It is to the entire record that we employ a clearly erroneous standard of review.
A finding of fact is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. On the other hand, where we are left with no such conviction, the finding is beyond our authority to disturb.
In the record before us we find substantial evidence that Ponthieux, Nixon, Sr., and Henry Leon Nixon, among others, combined and agreed prior to January 22, 1985, that Virginia Ponthieux Tucker should be killed and that Ponthieux would pay Nixon, Sr., that the job be done. The evidence is such that we could not begin to declare clearly erroneous the Circuit Court's finding of the existence of a conspiracy among and between Ponthieux, John B. Nixon, Sr., and Henry Leon Nixon.[4] SeeJames v. State, 481 So.2d 805, 808-10 (Miss. 1985); Norman v.State, 381 So.2d 1024, 1028 (Miss. 1980). The statements at issue were either made by Nixon, Sr., or by Ponthieux through Nixon, Sr. Each falls within the rule in that each is "a statement by a co-conspirator [Nixon, Sr.] of a party" [Ponthieux] offered against Ponthieux. Moreover, each such statement was made in the course of and in furtherance of that conspiracy. Rule 801(d)(2)(E), Miss.R.Ev.
Henry Leon Nixon's testimony concerning statements made by his father was properly admitted, not as an exception to the hearsay rule, but as non-hearsay by virtue of Rule 801(d)(2)(E).
The assignment of error is denied. *Page 1245 
 IV.
Ponthieux assigns as error the Circuit Court's order overruling his objections to certain hearsay testimony of William O. Townsend, Esq., of Pearl, Mississippi, and Kenneth J. Rose, Esq., of Jackson, Mississippi. Townsend had served as attorney for John B. Nixon, Sr., while Rose had represented John B. Nixon, Jr., both in connection with prosecutions arising out of the murder of Virginia Ponthieux Tucker and the present indictment. Townsend and Rose each testified on direct examination that his respective client had on a prior occasion denied that Ponthieux had any involvement in Virginia's murder. The present assignment of error challenges the testimony elicited by the prosecution on cross-examination that Nixon, Sr. and Jr. had on still other occasions told other stories.
 A. Townsend
Summarized, the context is this: Through Henry Leon Nixon, the prosecution had placed before the jury statements made by Nixon, Sr. that Ponthieux had arranged and paid for the murder.[5]
Ponthieux sought to rebut this testimony by calling Townsend to establish that on another occasion much later in time — and long after the object of the conspiracy had been consummated,[6]
Nixon, Sr., had stated that Ponthieux had no involvement whatsoever in the murder.
Ponthieux's defense at trial was that John B. Nixon, Sr., his sons and Gilbert Jimenez had murdered Ponthieux's ex-wife and that he, Ponthieux, had nothing to do with it. He began his defense by calling Nixon, Sr., as a witness. Nixon, Sr., took the stand, claimed his Fifth Amendment privilege, and refused to testify. At this point, Ponthieux' trial counsel, Stephen Beach, III, offered as evidence (without objection) an affidavit signed by Nixon, Sr., on March 24, 1986.[7] In the affidavit, Nixon, Sr., swore that Ponthieux had not hired or paid him to murder his ex-wife and that Ponthieux had nothing to do with the murder.
Shortly thereafter, the defense called Townsend. Outside the presence of the jury defense counsel Beach stated that he wished to interrogate Townsend about statements Nixon, Sr., had made on an occasion some five weeks earlier when the latter was interviewed by Townsend and Beach at the Mississippi State Penitentiary at Parchman, Mississippi. The occasion was after Nixon, Sr., had been tried, convicted and sentenced to die — at a time when the conspiracy to murder Virginia Tucker had long since ended.
The Circuit Court stated its principal concern was the attorney-client privilege. The District Attorney, however, objected on hearsay grounds, stating that (in his view) the only possible hearsay exception would be as a statement against interest, see Rule 804(b)(3), Miss.R.Ev., following with an explanation why that exception did not apply. The Circuit Court rejected the hearsay objection, noting that the prosecution had already been allowed to proceed under the co-conspirator's exception, and stating
 I think it is highly unfair for the defendant not [to] be allowed to put on any hearsay statements that he may be able to put on from reliable sources that would perhaps serve to impeach the hearsay statements that we have already heard made supposedly from Mr. Nixon. I am going to let Mr. Townsend testify.
The Court then got into a colloquy with Townsend and held that the attorney-client privilege did not preclude his testimony.
Townsend testified that approximately five weeks before Ponthieux's trial Nixon, Sr., told him (in Beach's presence) that he had known Virginia for about two years before the murder and that they were having an affair. Townsend said that Nixon, Sr., also said that Virginia had given him about $3,000.00 in the fall of 1984 and that he had called Henry Leon in Texas to see *Page 1246 
about buying some marijuana. He said that they went to the Tuckers' house to commit a staged burglary. Henry Leon and Jimenez denied that Nixon, Sr., called them to Utica to participate in a staged burglary so that they could get money with which to buy drugs in Texas. Nixon, Sr., went on to describe intimate details about Virginia and her family. He said she came from a large family and he knew her birth date and said she was very passionate. He described a tattoo, a scar and Virginia's small toenails. Last, he said that things did not go as planned on the morning of January 22, 1985, and that he got mad and killed Virginia.
The testimony at issue in the present assignment of error came on cross-examination. Townsend admitted over defense objections that what has just been related was but one of four stories that Nixon, Sr., had told him prior to his trial. Nixon, Sr.'s first story had been that he had an alibi. The next story, which Nixon repeated more than once, was that Ponthieux had paid him. Nixon, Sr.'s third story was that he and Virginia were lovers and that they staged the burglary so that Virginia could commit insurance fraud. The fourth story was the one just mentioned, that the staged burglary was for money with which to buy drugs. Nixon, Sr., repeated the staged burglary stories approximately ten or fifteen times.
On appeal, Ponthieux' objection is predicated on the hearsay rules found in Rules 801 and 802. At trial, however, his objection was that the prosecution was getting into matters beyond the scope of direct examination, that is, beyond the interview where he, Beach, and Townsend were present with Nixon. Though inartfully worded, the objection seems to have been that the attorney-client privilege would preclude this other hearsay testimony.
We need to be clear about what is being challenged. Townsend was allowed on cross-examination to give testimony that Nixon, Sr., had told four "stories": (1) an alibi, (2) that Ponthieux had paid him, (3) the staged burglary so that Virginia could commit insurance fraud, and (4) the staged burglary for money with which to buy drugs. In each instance, the "story" Townsend testified Nixon, Sr., had told him was garden variety hearsay. It was testimony other than that of the declarant [Nixon, Sr.] to prove the truth of the matter asserted, that is, that Nixon, Sr., had told four separate and conflicting stories of what had happened.
Assuming arguendo, that Nixon, Sr., was "unavailable" in the sense that he had claimed his Fifth Amendment privilege, see
Rule 804(a)(1), what he told Townsend does not automatically become admissible. Rather, only if one of the exceptions within Rule 804(b) may be found to fit may Townsend be allowed to testify what Nixon, Sr., told him. Only one is close in point, the statement against interest within Rule 804(b)(3). But careful reflection upon the four "stories" makes clear that they were intended to serve, not prejudice, Nixon's interests. More fundamentally, we must not forget that Ponthieux is the person on trial here, not John B. Nixon, Sr. We hold that the testimony elicited through Townsend of Nixon, Sr.'s four stories, particularly the one in which he stated that Ponthieux hired him to kill Virginia, was inadmissible hearsay.
What makes this question so difficult is that Ponthieux, over the prosecution's hearsay objection, was allowed to offer equally blatant hearsay testimony to the effect that five weeks earlier Nixon had made extensive statements which exonerated Ponthieux. The prosecution argues that defendant thus opened the door. The Circuit Court had ruled that, if Ponthieux called Townsend to offer hearsay statements made by Nixon which exonerated Ponthieux, Townsend could be cross-examined about other contradictory statements made by Nixon, Sr.
The Rules of Evidence do not address this problem. We faced a version of it in Murphy v. State, 453 So.2d 1290 (Miss. 1984), also a capital murder case. In Murphy, the prosecution sat idly by while the defense on cross-examination elicited hearsay testimony from a witness (as distinguished from the case at bar, where the *Page 1247 
prosecution made a proper and timely and correct objection, only to have it overruled). Then on redirect the prosecuting attorney in Murphy, over defense objection, elicited further hearsay testimony, to the effect that another person had told the witness that the defendant had committed the murder. This Court reversed the conviction, noting:
 The State cannot sit silent while the defense elicits hearsay and then seek to solicit hearsay in response over the objection of the defense, based upon the State's initial failure to object. . . . To allow this is tantamount to allowing two wrongs in hope of arriving at a right.
Murphy, 453 So.2d at 1294. In reaching its decision this Court noted:
 [Y]ou simply cannot "open the door" to hearsay. Hearsay is incompetent evidence. You may open the door for collateral, irrelevant, or otherwise damaging evidence to come in on cross-examination, [citations omitted], but Mississippi recognizes no rule of law that allows double hearsay to be brought in through this open door.
Murphy, 453 So.2d at 1294.
The Circuit Court erred when it overruled the prosecution's hearsay objection to Townsend's testimony on direct examination. It erred similarly when it overruled Ponthieux's objections to Townsend's testimony on cross-examination. There may be a place for makeup calls on the football field, but such are wholly out of place in a court of law where the defendant is on trial for his life. See Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987).
 B. Rose
Though Rose was called in a similar context, his client, John B. Nixon, Jr., had taken the stand as a witness against Ponthieux and had testified that Nixon, Sr., had told him prior to January 22, 1985, that he had been hired by Ponthieux to kill Virginia Tucker. In defense, Ponthieux sought to rebut this testimony by calling Rose to testify that on other occasions John, Jr., had said that Ponthieux had nothing to do with the murder.
Rose testified that on April 4, 1986, Nixon, Jr., told Beach that Ponthieux was not involved in the murder. However, on cross-examination, Rose testified that Beach and Nixon, Jr., had a second conversation after Nixon, Jr., had entered his guilty plea, during which Nixon, Jr., clearly implicated Ponthieux in the crime.
John B. Nixon, Jr., was not unavailable. John, Jr., had been called as a witness for the prosecution. He had testified that shortly before January 22, he went to Ponthieux' home and was given $2300.00. John, Jr., added
 when he [Ponthieux] handed me the money he said that he had paid my dad quite a bit of money and the job hadn't been done, and he said that he didn't want that money gave to him unless it was earned.
In this context, Ponthieux was entitled of right to call a witness such as Rose to rebut John, Jr.'s testimony. In fact, Rose testified that on April 4, 1986, John, Jr., told Beach in his [Rose's] presence that Ponthieux was not involved in the murder. Rose having made this statement, our question is whether the prosecution was entitled to show — as it did — that Rose had a second conversation with John, Jr., after he entered his guilty plea, in which John, Jr., had implicated Ponthieux in the crime.
Rule 801(d)(1)(B), Miss.R.Ev., declares that
 A statement is not hearsay if the declarant [John B. Nixon, Jr.] testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.
Applying the rule, we may only hold non-hearsay the statement Rose presented to the jury to the effect that, after his guilty plea, John, Jr., had implicated Ponthieux in Virginia's murder. John, Jr., testified as a witness for the prosecution and was cross-examined concerning his testimony regarding Ponthieux's role. The statement at issue here is consistent with John, Jr.'s earlier testimony, and it was offered by the *Page 1248 
prosecution to rebut a charge of improper influence or motive.
Insofar as we may be concerned with the challenge to Rose's testimony, the assignment of error is denied.
 C.
The question finally becomes whether the error in allowing the District Attorney's cross-examination of Townsend, as found in Part A above, rises to the dignity of reversible error. For our standard, we turn to Rule 103(a), Miss.R.Ev., which directs affirmance unless the party against whom evidence has been erroneously received has been denied a substantial right. Here the right at stake is no less than Ponthieux's right to a fair trial.
Ponthieux took the witness stand in his own defense and steadfastly denied any involvement in his ex-wife's death. Quite apparently, Ponthieux's fate would rise or fall on his credibility in the eyes of the jury. The erroneously admitted testimony of William O. Townsend, Esq., however, concerned the credibility of John B. Nixon, Sr., not Ponthieux. The testimony at issue was that Nixon, Sr. had cooked up four separate scenarios how the killing had occurred. One is left with the impression that Nixon, Sr., was not worthy of belief at all in this case. But let us not forget that Nixon, Sr., was not a witness in this case. When called he took the Fifth, stood mute, and has been assumed "unavailable". See Rule 804(a)(1), Miss.R.Ev.
The case for the prosecution rested primarily on the co-conspirator testimony of Henry Leon Nixon, John B. Nixon, Jr., and Gilbert Jimenez that, prior to January 22, 1985, Nixon, Sr., had told each of them that he, Nixon, Sr., had been hired by Ponthieux to kill Virginia Tucker. Nixon, Jr., added that Ponthieux gave him money in part payment of the murder hire. In this context we fail to see how discrediting non-witness Nixon, Sr., as one worthy of belief could aid the prosecution or disadvantage the defense. Remember, two of Nixon, Sr.'s scenarios elicited a staged burglary — which would if believed exonerate Ponthieux. A third — that Ponthieux hired the killing — was nothing more than a reiteration of what the jury had heard through at least three other witnesses any way.
In sum, we hold that the error found in Part A above did not adversely affect Ponthieux's right to a fair trial. Put otherwise, in the context of this record and the course of proceedings below, we find the error harmless beyond a reasonable doubt. The assignment of error is denied.
 V.
Ponthieux presents several further assignments of error, none of which merit either discussion or reversal. Each is denied.
CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
[1] In March, 1986, Nixon, Sr., was convicted of capital murder and sentenced to die. See Nixon v. State, 533 So.2d 1078 (Miss. 1987). The chief witness against Nixon, Sr., was Gilbert Jimenez, who had earlier pled guilty to conspiracy to commit capital murder and been sentenced to twenty years imprisonment. On April 16, 1986, Henry Leon Nixon and John Nixon, Jr., entered guilty pleas. Henry Leon pled guilty to conspiracy and received a twenty year sentence. John, Jr., pled guilty to accessory after the fact and received a five year sentence. Apparently, John, Jr.'s plea was the product of a package deal, whereby the State would accept the plea and recommend a sentence only if John, Jr., and Henry Leon simultaneously pled guilty and only if John, Jr., agreed to testify against Ponthieux.
[2] The Supreme Court of the United States has recently considered questions quite like today's though arising under the Federal Rules of Evidence, Bourjaily v. United States,483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). We have looked to theBourjaily opinion for guidance.
[3] The Circuit Court in certain circumstances — and within its sound and judicious discretion — may hold evidence conditionally admissible, although a mistrial may be mandated if the condition is not subsequently supplied.
[4] Henry Leon Nixon had, prior to Ponthieux's trial, pleaded guilty to the crime of conspiracy to commit capital murder.
[5] We have held these statements admissible under Rule 801(d)(2)(E). See Part III above.
[6] No one has suggested any possible conspiracy to cover up the murder of Virginia Tucker, and we express no opinion how that hypothesis might affect our decision.
[7] March 24, 1986, was the first day of Nixon, Sr.'s capital murder trial.
 *Page 581